# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

LAURA T. STONE                                                      PLAINTIFF


v.                                    NO. 4:08CV00079 HDY


MICHAEL J. ASTRUE,                                                 DEFENDANT
Commissioner of the Social
Security Administration


## MEMORANDUM OPINION AND ORDER


BACKGROUND.  The record reflects that in May of 2005, plaintiff Laura T. Stone

("Stone") filed an application for disability insurance benefits pursuant to the provisions

of the Social Security Act ("Act").  Her application was denied initially and upon

reconsideration.  She next requested, and received, a de novo administrative hearing

before an Administrative Law Judge ("ALJ").  In March of 2007, the ALJ issued a decision

adverse to Stone.  She appealed the adverse decision to the Appeals Council.  The

decision was affirmed by the Appeals Council, and, as a result, the decision became the

final decision of the Commissioner of the Social Security Administration

("Commissioner").  In January of 2008, Stone commenced the proceeding at bar by filing

a complaint pursuant to 42 U.S.C. 405(g).  In her complaint, she challenged the final

decision of the Commissioner.

STANDARD OF REVIEW.  The sole inquiry for the Court is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. See Prosch v. Apfel, 201 F.3d 1010 (8th Cir. 2000).  "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusions." See Id. at 1012.

THE COMMISSIONER'S FINDINGS.  The Commissioner made findings pursuant to the five step sequential evaluation process.  At step one, the Commissioner found that Stone has not engaged in substantial gainful activity since the alleged onset date.  At step two, the Commissioner found that Stone has the following severe impairments: degenerative disc disorder and depression.  At step three, the Commissioner found that Stone does not have an impairment or combination of impairments listed in, or medically equal to one listed in, the governing regulations.  The Commissioner then assessed Stone's residual functional capacity and found that she is capable of performing a "light level of exertion."  See Transcript at 19. At step four, the Commissioner found that Stone is incapable of performing her past relevant work.  At step five, the Commissioner found that, considering Stone's residual functional capacity, age, education, and work experience in conjunction with the testimony of a vocational expert, there are other jobs that exist in significant numbers in the national economy that Stone can perform. Given that finding, the Commissioner concluded that Stone is not disabled within the meaning of the Act.

STONE'S POINTS FOR REVIEW.   Are the Commissioner's findings supported by substantial evidence on the record as a whole?   Stone thinks not and advances the following points for review:

> The [Commissioner] erred in this matter in that she failed to properly develop the evidence, failed to consider evidence which fairly detracted from her findings, and failed to apply proper legal standards in assessing credibility of subjective complaints, assigning weight to medical opinions, and in assigning [a residual functional capacity] to [Stone].  [The Commissioner] further erred in relying on [vocational expert] testimony to meet [the Commissioner's] burden at the [fifth] step of the sequential evaluation process [footnote omitted] when that testimony was given in response to a flawed hypothetical question, which did not include all of [Stone's] impairments which are supported by the record.   [The Commissioner] erroneously used that [vocational expert] testimony to deny [Stone] benefits based on the framework of the Medical Vocational Guidelines (Grids) [footnote omitted].

See Document 6 at 13-14.

FAILURE TO PROPERLY DEVELOP THE EVIDENCE.   Stone first maintains that the Commissioner failed to properly develop the evidence.  Stone specifically maintains that "[t]here were no mental evaluations … by treating doctors or consultative examiners."  See Document 6 at 14.   Because there were none, the Commissioner should have obtained a mental evaluation of Stone.  She also specifically maintains that there were no "physical [residual functional capacity assessments] by treating doctors when the case was before the ALJ."   See Document 6 at 15.   Because there were none, the Commissioner should have obtained an assessment of Stone's physical restrictions.

The Commissioner has an obligation to fully and fairly develop the record.  <u>See</u> <u>Battles v. Shalala</u>, 36 F.3d 43 (8th Cir. 1994).  This obligation exists even if the claimant is represented by counsel at the administrative hearing.  <u>See</u> <u>Boyd v. Sullivan</u>, 960 F.2d 733 (8th Cir. 1992).[1]  There is no bright line test for determining whether the Commissioner has fully and fairly developed the record; that determination is made on a case-by-case basis.  <u>See</u> <u>Battles v. Shalala</u>, 36 F.3d at 45.

In developing the record, the Commissioner is required to obtain additional medical examinations and/or testing only if the record does not provide sufficient medical evidence to determine whether the claimant is disabled.  <u>See</u> <u>Barrett v. Shalala</u>, 38 F.3d 1019 (8th Cir. 1994) [citing, in part, 20 C.F.R. 404.1519a(b)].  <u>See</u> <u>also</u> <u>Dozier v. Heckler</u>, 754 F.2d 274 (8th Cir. 1985) (reversible error not to order consultative examination when such evaluation is necessary to make informed decision).  20 C.F.R. 404.1519a(b) identifies several instances in which additional medical examinations and/or testing is warranted; they include the following: (1) where the additional evidence needed is not contained in the records of the claimant's medical sources; or (2) where a conflict, inconsistency, ambiguity, or insufficiency in the evidence must be resolved and the Commissioner is unable to do so by re-contacting the medical sources.

---

[1]

"This is so because an administrative hearing is not an adversarial proceeding. ... '[T]he goals of the [Commissioner] and the advocates should be the same: that deserving claimants who apply for benefits receive justice.'"  <u>See</u> <u>Wilcutts v. Apfel</u>, 143 F.3d 1134, 1137-1138 (8th Cir. 1998) [quoting <u>Battles v. Shalala</u>, 36 F.3d at 44].

With regard to Stone's assertion that there was never a mental evaluation of her, and that the Commissioner was obligated to obtain one, the Court has reviewed the record and cannot find an evaluation and/or assessment of Stone's mental restrictions. For the reasons that follow, though, there is sufficient evidence to enable the Commissioner to ascertain the extent of the restrictions, and thus, it cannot be said that the Commissioner failed to properly develop the evidence with regard to the restrictions.

First, the Commissioner could and did consider the lack of treatment Stone received for her mental restrictions and that, when treated, her condition improved. The record reflects that she saw Dr. Lee Tackett in July of 2002 complaining of, inter alia, anxiety, nervousness, and mood swings. See Transcript at 120. He noted that she was not taking any medication at that time for her symptoms but did prescribe Xanax.[2] He saw her again the following month and diagnosed her with depression. See Transcript at 119. He failed to note, however, whether she was taking the prescribed medication.

The record indicates that Stone sought no treatment for her mental restrictions between August of 2002 and July of 2004. In July of 2004, she saw Dr. Scott Kuykendall ("Kuykendall"), a treating physician, seeking an anti-depressant. See Transcript at 158. He noted that she was not suicidal and that her condition improved with Lexapro.[3]

---

[2]

The Court understands "Xanax" to be a trade name for alprazolam, a drug used in the treatment of anxiety disorders.

[3]

The Court understands "Lexapro" to be a trade name for escitalopram, a drug used in the treatment of depression and anxiety.

The record contains no indication that Stone was seen and/or evaluated for her mental restrictions again until August of 2005 when she was seen by Dr. Garry Stewart ("Stewart"), a state agency physician. <u>See</u> Transcript at 144-151. His findings with regard to her mental restrictions are scant; he simply noted that she was oriented as to time, person, and space, and exhibited no evidence of psychosis. <u>See</u> Transcript at 149.

In October of 2005, Stone was seen by a physician's assistant. <u>See</u> Transcript at 169. Although the notes compiled during that visit are difficult to read, it appears that the Commissioner's interpretation of the notes is accurate, <u>i.e.</u>, "[Stone's] mood and affect were anxious. However, ... [her] judgment was intact. Her insight was also normal, as was her orientation. Her memory to recent and remote events was noted to be intact as well. ... [She] did not appear to be agitated." <u>See</u> Transcript at 18.

Stone apparently did not again seek treatment for her mental restrictions until May of 2006 when she saw Dr. Joe Dunaway ("Dunaway"). <u>See</u> Transcript at 254. The record indicates that she saw him for the purpose of obtaining a prescription for an anti-depressant. He diagnosed her as suffering from depression and prescribed Lexapro. Stone saw Dunaway again in August of 2006 for a check-up. <u>See</u> Transcript at 253. He again noted her depression but noted that Lexapro was helping. He continued her on Lexapro and told her to return if her condition worsened. In a subsequent visit with another physician at the same office, no mention was made of her depression. <u>See</u> Transcript at 252.

Second, in addition to considering the lack of treatment Stone received for her mental restrictions and that, when treated, her condition improved, the Commissioner could and did consider that Stone's mental restrictions did not prevent her from performing many of her daily activities. She reported that she is capable of caring for herself, performing household chores, attending to her personal affairs, running errands, and interacting with family and friends at church and in her own home. See Transcript at 255-256.

For these reasons, the Court is satisfied that the record contains sufficient evidence to enable the Commissioner to ascertain the extent of Stone's mental restrictions. It therefore cannot be said that the Commissioner failed to properly develop the evidence with regard to Stone's mental restrictions.

Stone additionally maintains that there were no "physical [residual functional capacity assessments] by treating doctors when the case was before the ALJ," see Document 6 at 15, and that the Commissioner was obligated to obtain one. The Court has reviewed the record and cannot find an evaluation and/or assessment of Stone's physical restrictions that was prepared by a treating physician prior to the date of the ALJ's decision. For the reasons that follow, though, there is sufficient evidence to enable the Commissioner to ascertain the extent of Stone's physical restrictions, and thus, it cannot be said that the Commissioner failed to properly develop the evidence with regard to the restrictions.

The Court begins by noting that Stone appears to place the burden of proof on the Commissioner. It is the claimant, however, who bears the burden of proving her physical restrictions and/or residual functional capacity. See Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005). Thus, Stone has the burden of proving her physical restrictions.

Notwithstanding the foregoing, the record contains at least two different assessments of Stone's physical restrictions. See Transcript at 110-117, 126-135, and 144-151. The assessments were not prepared by treating physicians prior to the ALJ's decision but were instead prepared by state agency physicians. The Court has reviewed the findings made by the state agency physicians, and it appears that the findings are consistent with the findings made by Stone's treating physicians.[4]

---

[4]

The Commissioner has summarized the medical evidence touching on Stone's physician restrictions. The Court adopts that summary. It is as follows:

A CT scan of the cervical spine performed in November 2002 showed no evidence of a mass. The cervical soft tissues were within normal limits as well (Tr. 124). A magnetic resonance imaging (MRI) scan of the cervical spine in November 2002 revealed a prior disc fusion at C5-C6 but without any evidence of disc protrusion. At the C6-C7 levels, there was a left anterolateral disc that only mildly encroached at the thecal sac (Tr. 125). Dr. Tackett's November 13, 2002, examination reveal neck pain but no radiculopathy to the arms (Tr. 163). Dr. Kuykendall's examination of [Stone's] musculoskeletal performed in January and April 2003, showed no signs of edema, clubbing or cyanosis (Tr. 159-160). An orthopedic examination dated August 24, 2005, and administered by examining physician Dr. Stewart, revealed normal range of motion involving the cervical and lumbar spine and both upper and lower extremities. The musculoskeletal and neurological examinations were with normal limits as well (Tr. 144-49). Jeanie Finley's examination of [Stone's] gait and station performed in October 2005 was described as normal. Her joints, bones and muscles were also described as normal, as was her muscle strength, stability and range of motion (Tr. 169). Subsequent examinations of [Stone's] extremities during the period from May 22, 2006 through December 29, 2006, continued to show no signs of edema, cyanosis or edema (Tr. 252-54).

See Document 7 at 10.

The record does, however, contain an assessment of Stone's physical restrictions by a treating physician after the ALJ's decision.  In October of 2007, or roughly seven months after the ALJ's decision, Kuykendall completed a physical residual functional capacity questionnaire on Stone's behalf.  <u>See</u> Transcript at 381-386.  In it, he diagnosed her with osteoarthritis, HNP, and RLS.[5]  He opined, <u>inter alia</u>, that she "constantly" has problems maintaining attention and concentration sufficient to perform even simple tasks; is incapable of tolerating stress associated with a "low stress" job; can sit and stand/walk for less than two hours in an eight hour workday; can lift virtually no weight; and can "rarely" twist, stoop, crouch, or climb.  The questionnaire appears to be accompanied  by the results of a magnetic resonance imaging ("MRI") examination performed in October of 2007.  <u>See</u> Transcript at 387.  The results reflect a normal lumbar alignment and normal vertebral body heights.  A mild disc space narrowing was noted, and Kuykendall diagnosed Stone with a small central disc herniation at L5-S1.

Kuykendall's physical residual functional capacity questionnaire was submitted to the Appeals Council during the course of Stone's appeal.  The questionnaire was received into evidence and made a part of the record.  <u>See</u> Transcript at 8.  The Appeals Council considered the findings contained in the questionnaire but determined that they did not "provide a basis for changing the [ALJ's] decision."  <u>See</u> Transcript at 6.

---

[5]

The Court understands "HNP" to be herniated nucleus pulposus, or a slipped disk along the spinal cord.  The Court understands "RLS" to be restless leg syndrome.

The opinion of a treating physician is typically accorded much weight.  See Choate v. Barnhart, 457 F.3d 865 (8th Cir. 2006).  It is accorded controlling weight if it is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] … record.'"  See Id. at 869 [quoting  20 C.F.R. § 404.1527(d)(2)].  The opinion may be discounted if "other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions."  See Id. at 869 [internal quotations omitted].

Having reviewed the record, the Court finds that the Commissioner could properly discount the findings of Kuykendall reflected in the physical residual functional capacity questionnaire.  They are simply not consistent with the findings from the October of 2007 MRI or with the other evidence in the record.  Kuykendall's findings paint a picture of an individual who can do very little, e.g., the individual is incapable of tolerating stress associated with even a "low stress" job, can sit and stand/walk for less than two hours in an eight hour workday, and can lift virtually no weight, but nothing else in the record suggests that Stone's physical restrictions are so severe.

Notwithstanding Kuykendall's findings, the Court is satisfied that the record contains sufficient evidence to enable the Commissioner to ascertain the extent of Stone's physical restrictions.  It therefore cannot be said that the Commissioner failed to properly develop the evidence with regard to Stone's physical restrictions.

FAILURE TO CONSIDER EVIDENCE THAT FAIRLY DETRACTED FROM THE
COMMISSIONER'S FINDINGS.   Stone next maintains that the Commissioner failed to
consider evidence that fairly detracted from the findings.  Stone specifically maintains
that the Commissioner failed to consider the "reported side effects of medication."  See
Document 6 at 17.  She additionally maintains that the Commissioner failed to consider
the following: "[the] limitations on sitting, standing, and walking as set down by ...
Kuykendall.  ...  These clearly restrict [Stone] to less than an eight (8) hour workday.
[Kuykendall] also restricted her to no lifting ... which would make light work impossible
because it requires lifting up to 20 pounds."  See Document 6 at 17.

This point for review is tantamount to a challenge to the Commissioner's
obligation to fully and fairly develop the record.  As the Court noted above, there is no
bright line test for determining whether the Commissioner has fully and fairly developed
the record; that determination is made on a case-by-case basis.

With regard to Stone's assertion that the Commissioner did not consider the
reported side effects of medication, the record reflects that she testified that her
medication, apparently hydrocodone, makes her "really sleepy and ... nauseated and ...
[she does not] like the way it makes [her] feel."  See Transcript at 416.  Although it is
not abundantly clear, it is also possible to construe her testimony to include the
complaint that other medication makes her unable to sleep, thereby giving rise to
complaints of fatigue.  See Transcript at 419.

-11-

The record reflects that the Commissioner considered the side effects of Stone's medication.  He specifically found the following:

> [Stone] also testified that her medication therapy causes adverse side effects such as tiredness and nausea.  The record fails to support this allegation.  If [she] were truly experience adverse side effects, she would have reported them to her physician and sought a different medication.  There is sufficient legal reason to reject complaints of disabling side effects of medication when the claimant has not complained about these effects to her treating physician.  …

See Transcript at 22.

For the reasons that follow, the Court finds that the Commissioner could properly discount the severity of the side effects of Stone's medication.  First, in separate social security disability report forms, Stone reported that her pain medication makes her sleepy but reported no other significant side effects from her medication.  See Transcript at 329, 350.  Second, she has not directed the Court to any report from a physician prior to the ALJ's decision in which she complained of significant side effects from her medication.  Third, her testimony as to the side effects of her medication appears to be somewhat inconsistent in that, on one hand, she reported drowsiness and, on the other hand, fatigue brought about by a lack of sleep.  Fourth, although she notes that Kuykendall recorded her complaints of side effects from her medication in a physical residual functional capacity questionnaire prepared after the ALJ's decision, see Transcript at 381, Kuykendall's notations are extremely difficult to read and there is no indication as to the severity of the side effects.

-12-

With regard to Stone's assertion that the Commissioner did not consider the restrictions found by Kuykendall in the physical residual functional capacity questionnaire, the Commissioner could properly discount Kuykendall's findings.  As the Court found above, his findings are simply not consistent with the findings from the October of 2007 MRI or with the other evidence in the record.  Kuykendall's findings paint a picture of an individual who can do very little, but nothing else in the record indicates that Stone's physical restrictions are so severe.  Alternatively, the record reflects that the Commissioner included some of Kuykendall's findings in assessing Stone's residual functional capacity.  In that assessment, the Commissioner found that Stone's ability to function is diminished in the following manner:

> by pain, fatigue, lack of sleep, headaches, and adverse side effects of her medication with the following mental limitations: [Stone] can perform work where incidental contact is routine but superficial, the complexity of tasks is learned by experience with some variables, and supervision required is little for routine work but more for non-routine work.

See Transcript at 19.

For these reasons, the Court finds that the Commissioner could properly discount the severity of the side effects of Stone's medication and the restrictions found by Kuykendall.  It therefore cannot be said that the Commissioner failed to consider evidence that fairly detracted from the findings or that the Commissioner failed to properly develop the evidence.

-13-

FAILURE TO PROPERLY ASSESS SUBJECTIVE COMPLAINTS.  Stone next maintains that her subjective complaints were not properly assessed.  She specifically maintains, inter alia, that the severity of her pain was discounted because the Commissioner improperly relied upon a few daily activities she can perform; ignored repeated diagnosis of "HNP, DJD, DDD, and nerve impingement," see Document 6 at 21, and ignored the side effects of her medication.[6]

In Pearsall v. Massanari, 274 F.3d 1211, 1217-1218 (8th Cir. 2001), the Court of Appeals stated the following with regard to the proper evaluation of a claimant's subjective complaints:

> It is the [Commissioner's] responsibility to determine a claimant's RFC [i.e., residual functional capacity] based on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations. ...  Before determining a claimant's RFC, the [Commissioner] first must evaluate the claimant's credibility.  In evaluating subjective complaints, the [Commissioner] must consider, in addition to objective medical evidence, any evidence relating to: a claimant's daily activities; duration, frequency and intensity of pain; dosage and effectiveness of medication; precipitating and aggravating factors; and functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320 (8th Cir.1984).  Subjective complaints may be discounted if there are inconsistencies in the evidence as a whole.  ...  The credibility of a claimant's subjective testimony is primarily for the [Commissioner] to decide, not the courts.  ...

---

[6]

The Court understands "DJD" to be degenerative joint disease, also known as osteoarthritis.  The Court understands "DDD" to be degenerative disc disease, a gradual deterioration of the disc between the vertebrae.  The Court understands "nerve impingement" to be pressure placed on a nerve by connective tissue, joints, or skin.

The Commissioner must make express credibility determinations and set forth the inconsistencies in the record which cause the Commissioner to reject the claimant's complaints.  See Eichelberger v. Barnhart, 390 F.3d 584 (8th Cir. 2004) [citing Masterson v. Barnhart, 363 F.3d 731 (8th Cir. 2004)].  The Commissioner need not explicitly discuss each Polaski v. Heckler factor but "only need acknowledge and consider those factors before discounting a claimant's subjective complaints."  See Id. at 590 [citing Strongson v. Barnhart, 361 F.3d 1066 (8th Cir. 2004)].[7]

The Court has carefully reviewed the Commissioner's treatment of Stone's subjective complaints.  For the reasons that follow, the Court is satisfied that the Commissioner's analysis conforms to the requirements of Polaski v. Heckler.

First, the Commissioner recognized the prevailing legal standard in considering Stone's subjective complaints, specifically, the Commissioner cited Polaski v. Heckler as well as Social Security Rule 96-7P.[8]  Any suggestion that the Commissioner did not recognize the prevailing legal standard is without merit.

---

[7]

An additional note is in order.  Complaints of fatigue are analyzed under the same standard as complaints of pain.  See Jackson v. Bowen, 873 F.2d 1111 (8th Cir. 1989).

[8]

Social Security Ruling 96-7p provides that the Commissioner's evaluation of a claimant's credibility must contain "specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight…. It is not sufficient for the adjudicator to make a single, conclusory statement that the individual's allegations have been considered … [nor is it] enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms."  See Arnold v. Barnhart, 473 F.3d 816, 822 (7th Cir. 2007).

Second, the Commissioner properly applied the <u>Polaski v. Heckler</u> factors.  With regard to Stone's daily activities, the Commissioner found that they do not suggest significant physical or mental restrictions.  <u>See</u> Transcript at 18, 21-22.  There is nothing to indicate that the Commissioner gave too much, or too little, weight to any one of Stone's activities.  With regard to the duration, frequency and intensity of her pain, the Commissioner found that Stone suffers from some pain and that it impacts her residual functional capacity.  <u>See</u> Transcript at 19.  The Commissioner could and did nevertheless find that the pain was not so great that it significantly impacted Stone's residual functional capacity.  For instance, she clearly experiences some back pain.  The results of the October of 2007 MRI revealed, though, only a mild disc space narrowing, and Kuykendall diagnosed her with a small central disc herniation at L5-S1.  With regard to the dosage, effectiveness, and side effects of Stone's medication, the Commissioner found that Stone's depressive symptoms improve with Lexapro, <u>see</u> Transcript at 18; that her restless leg syndrome improves with Requip, <u>see</u> Transcript at 20; and that she takes hydrocodone for her pain, <u>see</u> Transcript at 20.  Although these medications cause some side effects, the Commissioner took the side effects into account in assessing Stone's residual functional capacity.  <u>See</u> Transcript at 19.

For these reasons, the Court finds that the Commissioner's treatment of Stone's subjective complaints conforms to the requirements of <u>Polaski v. Heckler</u>.  The Commissioner's findings are supported by substantial evidence on the record as a whole.

-16-

FAILURE TO ASSIGN ANY WEIGHT TO A TREATING PHYSICIAN'S OPINION.  Stone next maintains that the Commissioner failed to assign any weight to a treating physician's opinion.  Specifically, she maintains that the Commissioner failed to assign any weight to Kuykendall's findings reflected in his physical residual functional capacity questionnaire and in the accompanying MRI.  The Court previously addressed a similar assertion, see supra at 13, and will not repeat that analysis.  It is enough to note that the Commissioner could properly discount Kuykendall's findings in the questionnaire because they are not consistent with the findings from the October of 2007 MRI or with the other evidence in the record.   Alternatively, the record reflects that the Commissioner included some of Kuykendall's findings in the assessment of Stone's residual functional capacity.

FAILURE TO PROPERLY ASSESS RESIDUAL FUNCTIONAL CAPACITY.  Stone next maintains that her residual functional capacity was improperly assessed.  Specifically, she maintains that the Commissioner's residual functional capacity assessment did not properly characterized the extent of her restrictions, those being the following:

> [her] persistent fatigue, her inability to sit, stand, or walk for prolonged periods or in combination for an eight (8) hour workday, or to lift any weight at all …

> If the [Commissioner] had included these limits [Stone] would clearly be restricted to less than the broad range of light work which [the Commissioner] assigned to [Stone].

-17-

> The [Commissioner] points to no medical support of [the residual functional capacity assessment] other than the agency non-treating, non-examining doctors ..., whose opinion was vary different from the [Commissioner's], though not helpful to [Stone] either.

See Document 6 at 24.

A claimant's residual functional capacity is simply an assessment of "the most a person can do despite that person's limitations." See Brown v. Barnhart, 390 F.3d 535, 538-39 (8th Cir. 2004) [citing 20 C.F.R. 404.1545(a)(1)]. The assessment is made using all of the relevant evidence in the record and must be supported by "medical evidence that addresses [the person's] ability to function in the workplace." See Id. at 539 [citing Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003)].

The bulk of this point for review centers upon the Commissioner's discounting of Kuykendall's findings in the physical residual functional capacity questionnaire. As the Court has found, the Commissioner could properly discount Kuykendall's findings in the questionnaire. Alternatively, Stone has not directed the Court to findings that support a greater degree of restriction than that found by the Commissioner.

IMPROPER HYPOTHETICAL QUESTION. Stone last maintains that the Commissioner posed improper hypothetical questions to the vocational expert. Specifically, Stone maintains that the hypothetical questions were flawed because they did not contain all of her restrictions, e.g., it did not include her fatigue or pain.

-18-

"'[T]estimony from a vocational expert is substantial evidence [on the record as a whole] only when the testimony is based on a correctly phrased hypothetical question that captures the concrete consequences of a claimant's deficiencies.'"  See McKinley v. Apfel, 228 F.3d 860, 865 (8th Cir. 2000) [quoting Taylor v. Chater, 118 F.3d 1274, 1278 (8th Cir. 1997)].   The question need not contain every impairment alleged by the claimant, see Haggard v. Apfel, 175 F.3d 591 (8th Cir. 1999), but it must include the impairments supported by substantial evidence on the record as a whole.  See Goff v. Barnhart, 421 F.3d 785 (8th Cir. 2005).

The Court has carefully reviewed the hypothetical questions posed to the vocational expert.  The series of questions begins with the Commissioner identifying the hypothetical individual's restrictions, which included the following: "[the hypothetical individual] can occasionally stoop, occasionally bend, occasionally kneel, occasionally crawl.  Due to pain, fatigue, side effects of lack of sleep, headaches, side effects of medication, mentally she learns by experience."  See Transcript at 422.  The subsequent questions assume a hypothetical individual with, inter alia, the same restrictions, e.g., pain, fatigue, side effects of lack of sleep, headaches, and side effects of medication. See Transcript at 422-425.  They are the same restrictions that Stone maintains the Commissioner did not include in the questions.  The Commissioner appears to have incorporated Stone's restrictions into the series of questions, and for that reason, the questions were not flawed.

CONCLUSION.  The Court finds that there is substantial evidence on the record as a whole to support the Commissioner's conclusion that Stone is not disabled within the meaning of the Act.  Accordingly, all requested relief is denied, and judgment will be entered for the Commissioner.

IT IS SO ORDERED this ____25____ day of February, 2009.


_____
UNITED STATES MAGISTRATE JUDGE